### VANDERWALL v MIDKIFF

Docket No. 89918. Submitted November 4, 1987, at Grand Rapids. Decided March 7, 1988. Leave to appeal applied for.

Claude J. Gelderloos executed a power of attorney appointing Jean Rowbotham as his attorney-in-fact and authorizing her to withdraw money from or deposit money into his bank accounts, to rent, lease, mortgage, sell, repair or occupy his real property and to do any other act which he had the legal right to perform. Following Gelderloos' death, Joel VanderWall was appointed personal representative of Gelderloos' estate. VanderWall learned that, prior to Gelderloos' death, Rowbotham had withdrawn monies from several bank accounts Gelderloos had held jointly with others and that Rowbotham had in turn deposited the funds into new accounts, naming herself, Jeannette Fenn and Alvias A. Nicholes as joint owners with Gelderloos. VanderWall also learned that Rowbotham had forged Gelderloos' name on a deed conveying Gelderloos' home to Danny W. Midkiff. VanderWall brought an action in Ottawa Circuit Court against Judith Midkiff (personal representative of the estate of Danny W. Midkiff, who had died before the action was commenced), Rowbotham, Fenn and Nicholes. Plaintiff sought the return of the money transferred from Gelderloos' bank accounts and title to the home received by Danny W. Midkiff. Kenneth V. and Dorothy E. Ray, who had purchased the home from Danny W. Midkiff without knowledge of the forged deed to Midkiff, brought a motion to intervene, which the trial court, Calvin L. Bosman, J., granted. The Rays filed a cross-claim against Judith Midkiff regarding the land contract they had with Danny W. Midkiff. Pursuant to an agreement between the parties, the trial court directed the Rays to pay the balance of the land contract price to the clerk of the court, who would hold it in escrow. Judith Midkiff filed a cross-claim

REFERENCES

Am Jur 2d, Agency §§ 30, 32, 56, 275; Judgments §§ 106·et seq.

Federal Rules: practice and procedure with respect to motion for judgment notwithstanding verdict under Federal Civil Procedure Rule 50(b) or like state provision. 69 ALR2d 449.

See also the annotations in the Index to Annotations under Power of Attorney.

against Rowbotham and later added Transamerica Title Insurance Company as a third-party defendant regarding the conveyance of the Gelderloos home to Danny W. Midkiff. The trial court severed the Rays' cross-claim against Judith Midkiff and Judith Midkiff's cross-claim against Transamerica Title. The jury returned a verdict in favor of plaintiff, awarding him the monies transferred from Gelderloos' individually held bank accounts and title to the Gelderloos home. The jury also awarded monies transferred from accounts Gelderloos originally held jointly with two individuals to those individuals. On motions by defendants, the trial court granted them judgments notwithstanding the verdict, ruling that there was no evidence from which the jury could have concluded that Rowbotham had acted without Gelderloos' authority under the grant of the power of attorney. The trial court also conditionally granted defendants a new trial, ruling that the verdict was against the great weight of the evidence and that plaintiff's counsel had acted improperly in accusing Rowbotham of lying about the existence of an earlier power of attorney. Plaintiff appealed. Intervening defendants Ray cross-appealed, claiming that their status as bona fide purchasers of the Gelderloos home insulates them from plaintiff's action, and Transamerica Title cross-appealed, seeking to ascertain its liability should plaintiff prevail in his claim.

The Court of Appeals *held:*

1. Powers of attorney are to be construed in accordance with the principles governing the law of agency, one of which is that a person who undertakes to act as agent for another may not pervert his powers to his own personal ends and purposes without the consent of the principal after a full disclosure of the details of the transaction. In this case, while the power of attorney expressly authorized Rowbotham to transfer money from Gelderloos' bank accounts, Rowbotham herself testified that Gelderloos did not, at the time he signed the power of attorney, intend to authorize her to give his property away. The jury could have reasonably concluded from the rest of the evidence that Rowbotham did not transfer the money from the bank accounts at the request of Gelderloos. There was also evidence to support the reasonableness of the jury's finding that Gelderloos did not direct Rowbotham to convey his home to Danny W. Midkiff. The trial court thus erred in granting defendants' motions for judgment notwithstanding the verdict.

2. The trial court erred when it granted defendants' motions for a new trial on the grounds that plaintiff's counsel made inflammatory and improper accusations about Rowbotham's

failure to produce the first executed power of attorney. Plaintiff's counsel did not overstep the bounds of permissible advocacy in attacking Rowbotham's credibility over her failure to produce the first power of attorney.

3. As a forged document, the quitclaim deed from Gelderloos to Danny W. Midkiff did not operate to convey title in the Gelderloos home to Midkiff. This, in turn, precluded the Rays from taking good title from Midkiff, and the fact that the Rays took without notice of the forgery does not insulate them from plaintiff's claim. However, pursuant to the terms of the parties' agreement, plaintiff is to convey title to the Rays upon their full payment of the land contract balance.

4. Resolution of the question whether Transamerica Title or plaintiff is ultimately liable for attorney fees paid on behalf of the Midkiff estate depends upon several factual determinations which were unclear from the record. A remand on this issue is therefore necessary.

Reversed and remanded.

1. Motions and Orders — Judgment Notwithstanding the Verdict — Evidence.

The grant of a defendant's motion for a judgment notwithstanding the verdict is appropriate only if the evidence is insufficient as a matter of law to support a judgment for the plaintiff; in reaching a decision, the trial court must view the evidence in the light most favorable to the plaintiff and give the plaintiff the benefit of every reasonable inference that could be drawn from the evidence; if, after viewing the evidence in this manner, reasonable men could differ, the question is one for the jury and judgment notwithstanding the verdict is improper.

2. Agency — Powers of Attorney.

Powers of attorney are to be construed in accordance with the principles governing the law of agency.

3. Agency — Agents.

A person who undertakes to act as agent for another may not pervert his powers to his own personal ends and purposes without the consent of the principal after a full disclosure of the details of the transaction.

4. Agency — Powers of Attorney.

A power of attorney which is not coupled with an interest terminates upon the death of the grantor.

5. Deeds — Forgery — Subsequent Purchasers.

There can be no such thing as a bona fide holder under a forged

deed, whose good faith confers any rights against the party whose name has been forged, or those claiming under him; where a deed is forged, those innocently acquiring interests under the deed are in no better position as to title than if they had purchased with notice.

*James J. Kobza,* for plaintiff.

*Vander Ploeg, Ruck, Luyendyk & Wells* (by *Allan E. Vander Ploeg*), for defendant, cross-defendant, and third-party plaintiff Judith Midkiff.

*Bussard & Sielski* (by *James W. Bussard*), for defendant and cross-defendant Jean Rowbotham and defendants Jeannette Fenn and Alvias A. Nicholes.

*Roger, Meyers, Knoll, Bauer & Knoll* (by *George E. Bauer*), for intervening defendants and cross-plaintiffs Kenneth V. Ray and Dorothy E. Ray and third-party defendant Transamerica Title Insurance Company.

Before: WAHLS, P.J., and BEASLEY and D. A. BURRESS,* JJ.

BEASLEY, J. Plaintiff, Joel VanderWall, as personal representative of the estate of decedent Claude J. Gelderloos, appeals as of right from an order granting defendants' motions for judgment notwithstanding the verdict and ordering that a new trial be held. Intervening defendants, Kenneth V. and Dorothy E. Ray, cross-appeal, claiming that their status as bona fide purchasers of residential property insulates them from plaintiff's action. Third-party defendant, Transamerica Title Insurance Company, cross-appeals to ascertain its liability should plaintiff prevail in his claim.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

On October 13, 1980, Claude J. Gelderloos died intestate, leaving behind an estate that included numerous bank accounts, the family home, a cottage and a large amount of stock certificates. The next day, his wife of ten years, Zula Gelderloos, died after an extended bout with cancer. Prior to their marriage, Zula had been Gelderloos' live-in housekeeper. Four of her children from previous marriages, Jean Rowbotham, Jeannette Fenn, Alvias A. Nicholes and Danny Midkiff (now deceased, but by his estate), are defendants in this case. Danny Midkiff lived with Gelderloos and Zula. Even before Gelderloos married Zula, he treated Danny as his own son. He continued to do so after Danny had grown up.

A few months before his death, Gelderloos became ill and was unable to care for himself. Although his mind remained sharp, his physical condition and mobility diminished greatly; signing his name became an arduous task. On or about September 5, 1980, before he resided at a nursing home and while Zula was terminally ill, Gelderloos executed a power of attorney appointing his stepdaughter, defendant Rowbotham, as attorney-in-fact and granting her certain powers. The powers included the authority to (1) withdraw money from or deposit money into any of his several bank accounts and gain access to his safety deposit box, (2) rent, lease, mortgage, sell, repair or occupy his real property, and (3) do any other act which he would have the legal right to perform.

At trial, Rowbotham testified that this actually was the second power of attorney given to her by Gelderloos; she claimed that he had executed an earlier one August 26, 1980, and later, subsequent to trial, produced an instrument purporting to be the earlier power of attorney. She said the first power of attorney was deficient, however, in that it

failed to give her the authority to transact business with a certain bank. She claimed that for that reason a second power of attorney was executed. When Rowbotham testified that she could not find the first power of attorney, plaintiff's counsel suggested during cross-examination and closing argument that she was not telling the truth about its existence.

Rowbotham redistributed the contents of several bank accounts which Gelderloos held individually or jointly with Danny Midkiff, Jean VanderWall (his sister) and John VanderWall (his nephew). She deposited the money in several new accounts naming either herself or her two sisters, Fenn and Nicholes, as joint owners with Gelderloos. Rowbotham also transferred to Midkiff title to the family home and cottage. She did this by signing Gelderloos' name to the deed, although she failed to indicate that she was acting pursuant to a power of attorney. According to Rowbotham, Gelderloos or Zula allegedly directed all of Rowbotham's acts, which had the effect of dividing his assets approximately equally between his side of the family and Zula's.

After Gelderloos passed away, his nephew, Joel VanderWall, was appointed personal representative of his estate. While attempting to marshal the assets and administer the estate, VanderWall discovered some of Rowbotham's acts. He believed those acts were fraudulent and against the wishes of Gelderloos, basing that belief on a statement made by Gelderloos that he had made provisions in writing to take care of Jean and John VanderWall.

On November 4, 1983, VanderWall commenced the instant suit against defendants Rowbotham, Fenn, Nicholes and Judith Midkiff, personal representative of the estate of Danny W. Midkiff (Danny

Midkiff died shortly before the suit began) for the return of the money transferred from Gelderloos' bank accounts and title to the family home received by Midkiff. Kenneth and Dorothy Ray, who purchased the family home from Midkiff without knowledge of the alleged fraudulent conveyance, moved to intervene. On March 27, 1984, the court issued an order pursuant to an agreement between the parties that the estate of Midkiff could use the proceeds from the land contract with the Rays to pay for legal costs and attorney fees incurred in defending this action. On March 29, 1984, the Rays filed a cross-claim against Judith Midkiff, as personal representative of the estate of Danny W. Midkiff, for specific performance of the land contract and for damages resulting from Danny Midkiff's failure to convey marketable title to them upon tender of the full purchase price. Subsequently, pursuant to an agreement between the parties, the court directed the Rays to pay the balance of the land contract price to the clerk of the court, who would hold the money in escrow. Later, Judith Midkiff filed a cross-claim against Rowbotham for damages which might be incurred because of the alleged unauthorized conveyance of the home to Midkiff and for the return of the money held jointly by Gelderloos and Midkiff which Rowbotham had transferred to a different bank account. Midkiff amended her cross-claim to add Transamerica as a third-party defendant, claiming that Danny Midkiff was a third-party beneficiary to a title insurance policy issued by Transamerica to the Rays.

The court severed the Rays' cross-claim against Judith Midkiff and Midkiff's cross-claim against Transamerica. Those claims are not part of this appeal.

In August, 1985, a jury trial was held to deter-

mine the principal claims. Plaintiff's theory of the case was that the power of attorney given to Rowbotham was intended only to allow her to pay certain bills and to handle Gelderloos' personal affairs. Plaintiff alleged that Rowbotham had transferred title to the family home and redistributed the money without authority from Gelderloos. Defendants argued that Rowbotham acted pursuant to Gelderloos' direction only. Judith Midkiff also claimed that Midkiff's estate was entitled to the return of money held jointly in an account with Gelderloos and that, if the sale of the home was declared invalid, Midkiff's estate was entitled to damages from Rowbotham. The Rays asserted that, as bona fide purchasers of the home, they were entitled to clear title regardless of the outcome of the other claims.

Using a special verdict form agreed to by the parties, the jury found that Rowbotham had not acted under the direction of Gelderloos. Pursuant to that verdict, the court entered a judgment incorporating the jury verdict with remedies agreed upon by the parties. Plaintiff was awarded $55,930.12, the amount transferred from Gelderloos' individually held bank accounts, plus title to the family home or $45,000. Jean VanderWall was awarded $21,823.58 and John VanderWall $10,051.47, the money held jointly with Gelderloos prior to Rowbotham's transfers. The liability was distributed as follows: Rowbotham, $48,978.28; Fenn, $18,003.31; Nicholes, $21,823.58; and the estate of Midkiff, title to the home or $45,000.

Defendants Rowbotham, Fenn, Nicholes, Judith Midkiff and the Rays moved for judgments notwithstanding the verdict or, in the alternative, a new trial, alleging that the jury verdict was against the great weight of the evidence. The motions also were based on the allegedly inflam-

matory accusations by plaintiff's counsel that Rowbotham lied when she testified that Gelderloos had given her an earlier power of attorney, but that the document could not be located at the time of trial. The document allegedly was found after trial and was attached to the motion as an exhibit.

On December 5, 1985, the court granted judgment notwithstanding the verdict on the ground that there was no evidence at trial from which the jury could have concluded that Rowbotham had acted without Gelderloos' authority under the grant of the power of attorney. The court also conditionally granted each of the defendants a new trial for the reasons that the jury verdict was against the great weight of the evidence and that plaintiff's counsel had acted improperly in accusing Rowbotham of lying about the existence of the earlier power of attorney.

On appeal, plaintiff claims the trial court erred in concluding that the evidence did not support the jury's verdict. When deciding a motion for judgment notwithstanding the verdict, the court must view the evidence in a light most favorable to the nonmoving party, giving the nonmoving party the benefit of every reasonable inference that could be drawn from the evidence. It is not the province of the trial judge to second-guess the jury on essentially factual issues. If the evidence is such that reasonable persons could differ, the question is one for the jury and judgment notwithstanding the verdict is appropriate only if the evidence is insufficient as a matter of law to support a judgment for the nonmoving party.[1]

While the literal language of the power of attorney authorized transfer of money from certain bank accounts, Rowbotham testified that Gelder-

---

[1] Smart v The New Hampshire Ins Co, 148 Mich App 724, 730-731; 384 NW2d 772 (1985).

loos did not, at the time of signing the power of attorney on September 5, 1980, intend to authorize her to give his property away.[2] As a matter of fact, attorney Bussard drew the power of attorney without ever seeing or talking to Gelderloos; he took his instructions from Rowbotham and her mother. He was the family attorney for Rowbotham, but apparently had never represented Gelderloos. No explanation is offered as to why Gelderloos would attempt to make what was essentially a distribution upon death by the device of juggling joint accounts rather than the customary method of making and signing a will. The first power enumerated in that document clearly gave her the authority to deposit and withdraw money from the bank accounts in question without limitation to certain accounts. It is well established, though, that powers of attorney are to be construed in accordance with the principles governing the law of agency.[3] One of those principles is that a person who undertakes to act as agent for another may

[2] Rowbotham testified as follows:

> *Q.* Now, what was your understanding as to the reason—or, your understanding as to, again, as to why this particular day, September 5, 1980, Claude Gelderloos assigned to you a power of attorney in this form? Why did he do it?
> *A.* So I could take care of everything.
> *Q.* What do you mean by "taking care of everything"? What did you understand "taking care of everything" to mean?
> *A.* It meant paying their bills, depositing at the bank. It meant buying groceries. Everything that had to do with running their home.
> *Q.* All right. It did not intend and was not meant to authorize you to give his property away, was it?
> *A.* Not at that time, no.
> *Q.* And wasn't it your understanding that you were simply to start signing the checks rather than have him sign them out of this checking account, to keep the bills current?
> *A.* Right.

[3] 3 Am Jur 2d, Agency, § 30, pp 533-534.

not pervert his powers to his own personal ends and purposes without the consent of the principal after a full disclosure of the details of the transaction.[4] Hence, if Rowbotham acted in her own interests and not under the direction of Gelderloos, she may be liable to his estate for the monies wrongfully obtained or transferred.

Although there was no direct evidence that Rowbotham acted without the authority of Gelderloos, there was plenty of circumstantial evidence from which the jury could reasonably so conclude. The jury could have found Rowbotham's testimony to be false and not worthy of belief. During trial, she stated that she could not recall the whereabouts of $20,000 which she withdrew from a bank account on December 18, 1980. She also forgot to mention at her deposition, after being specifically questioned by plaintiff's counsel, that she had given $15,000 to her brother. The jury could have believed that it was unlikely that such large sums of money could slip someone's mind and, thus, doubted Rowbotham's credibility from that moment on.

Rowbotham admitted that she took money from a bank account after both Gelderloos and Zula had passed away. Upon Gelderloos' death, the power of attorney that he gave terminated automatically, since it was not coupled with an interest.[5] In addition, even she does not claim that Gelderloos ever discussed with her at all the amount, if any, of money she was to receive. She just took what was left over. These admissions indicate that she was not acting at the direction of Gelderloos, at least as to the money she kept for herself. Other evidence raised the inference that Gelderloos did

---

[4] *Stephenson v Golden,* 279 Mich 710, 735-737; 276 NW 849 (1937); 3 Am Jur 2d, Agency, § 88, p 599.

[5] *Chrysler Corp v Blozic,* 267 Mich 479, 482-483; 255 NW 399 (1934).

not direct her to close out the joint accounts with his sister, Jean VanderWall, his nephew John VanderWall, and Midkiff. Although these joint accounts had been in existence for many years, Rowbotham could not explain why Gelderloos would wait until the last few months of his life to change his mind as to who would receive the money.

All the witnesses agreed that Gelderloos maintained a close relationship with the VanderWall side of the family and with Midkiff. There was no evidence of any falling out that would have prompted him to change his bank accounts. Also, Rowbotham's credibility was cast more in doubt because she never disclosed to Joel VanderWall, the personal representative of Gelderloos' estate, her transference of the money, even though he specifically questioned her about the estate's assets.

Finally, the testimony of several witnesses directly controverted Rowbotham's assertion that Gelderloos directed her to change the bank accounts. One of plaintiff's witnesses, Bertha Nedervelt, testified that Gelderloos told her that when he died all his money would go to his sister and to his brother's children. Further, Joel VanderWall testified that Gelderloos told him on several occasions that he had made provisions in writing to provide for the care of Jean and John VanderWall. Although the writing might logically refer to a will or trust, since no such documents could be found, the jury might have inferred that the "writing" referred to the joint bank accounts which Rowbotham had closed out. Indeed, that is what Joel VanderWall testified that he believed. Even Nicholes, one of the primary defendants, testified that she could not explain why Gelderloos would instruct Rowbotham to withdraw money from the

joint account with Midkiff, since he often expressed concern over Midkiff not having enough money.

In summary, strong circumstantial evidence existed from which the jury could have reasonably concluded that Rowbotham did not transfer the money from certain bank accounts at the request of Gelderloos as she claimed. The question was one of fact for the jury and the question was submitted to the jury for determination. Seeing the witnesses and hearing their testimony, the jury decided whom and what to believe. The record does not support the trial judge's assertion that there was no material evidence inconsistent with Rowbotham's testimony. The trial judge erred by substituting his judgment as to the facts for that of the jury as a basis for rendering judgment notwithstanding the jury's verdict.

There was also evidence to support the reasonableness of the jury's finding that Gelderloos did not direct Rowbotham to transfer to Danny Midkiff title to the home and cottage. First, Rowbotham signed a deed in Gelderloos' name without indicating that she was doing so pursuant to the power of attorney. Moreover, when questioned by Joel VanderWall about Gelderloos' assets, she never revealed the property conveyance or her participation in that transaction. It was not until the deed was taken to a handwriting expert that the signature was confirmed to be hers and not Gelderloos'. Only after this did Rowbotham admit signing Gelderloos' name to the deed. It would not be surprising if the jury interpreted her conduct in this connection as an attempt to hide the truth.

Second, the jury could have reasonably declined to believe that, as several witnesses testified, Gelderloos stated his desire to give Midkiff the home for the past twenty years or more. At that time,

Midkiff would have been only twelve years old and Gelderloos and Zula would have been ten years away from marriage. Again, the jury could have disbelieved that Gelderloos desired to give such a valuable piece of property to a young child, especially when the child was not at that time related by blood or marriage.

Third, as previously indicated, Rowbotham herself admitted that, at the time Gelderloos executed the power of attorney, it was not meant to authorize making gifts of property. The power of attorney was meant to authorize her to keep any bills current. In fact, there had been no discussion with Gelderloos prior to the time he signed the power of attorney regarding the handling of real estate. If Gelderloos did have such a long-term desire to give Midkiff the home, as several defense witnesses testified, seemingly he would have mentioned this to Rowbotham at the time he gave her the power of attorney.

Plaintiff next argues that the trial court erred when it granted defendants' motions for new trial on the grounds that plaintiff's counsel made allegedly inflammatory and improper accusations about Rowbotham's failure to produce the first executed power of attorney. During cross-examination of Rowbotham, plaintiff's counsel questioned her about when the September 5, 1980, power of attorney had actually been typed. In response, Rowbotham, for the first time, made disclosure about an alleged earlier power of attorney given her by Gelderloos in the following exchange:

> *Q.* Well, I'm talking about when it was typed up. Are you claiming that Mr. Bussard [Rowbotham's attorney] wasn't told to type this document until September 5th?
> *A.* On September the 5th, sir, I had to go back

and get a different power-of-attorney papers drawn up. Claude had sent me to the bank, to Hackley Bank, and I couldn't do anything because Hackley Bank was not listed on the first one. There is another power-of-attorney paper that's identical to this one.

*Q.* Where is there another power of attorney identical to this one?

*A.* Did I give that to you, Mr. Bussard?

*Q.* Mrs. Rowbotham, unfortunately you have to answer my questions, ma'am, not ask your attorney questions. Did you mention any other power of attorney at any time prior to this moment in this entire two-year-old case? You haven't, have you?

*A.* No.

*Q.* Are you holding something back on us?

*A.* No. I have never held nothing back.

Later in the cross-examination, plaintiff's attorney questioned Rowbotham on how she could have added hers and Zula's names on a joint account with Gelderloos on September 5, 1980, when the power of attorney was not even executed until that date. The following exchange then occurred:

*Q.* Well, these show as two names added on September 5. That's the day you did it, the same day you got the power of attorney, isn't it?

*A.* The one power of attorney was August the 20 . . .

*Q.* What power of attorney?

*A.* The power of attorney for Mother was August the . . .

*Q.* 26th.

*A.* 26th. And I also had a power of attorney for him dated August the 26th.

*Mr. Kobza: [Attorney for Plaintiff]* Your Honor, I'm going to ask the Court to demand of Mr. Bussard right now to make a declaration as to whether he's suppressed a document so crucial to this case that he's been under order to deliver to

me many months ago. This is the first that I've
heard anything about a prior document. I think,
without Mr. Bussard being asked to testify, he's an
Officer of this Court and he ought to be . . .
   *Mr. Bussard:* Well, just a minute.
   *Mr. Kobza:* He ought to be made to answer this,
this kind of testimony if he has such a document.
If he hasn't, fine.
   *Mr. Bussard:* I haven't such a document.
   *Mr. Kobza:* Have not?
   *Mr. Bussard:* You don't want to listen to her
explanation, but I don't have such a document.
You don't want to hear her story, Mr. Kobza.
That's the problem.
   *Mr. Kobza:* You can bring it out.
   *Mr. Bussard:* You've asked her . . .
   *The Court:* Okay, he has stated he doesn't have
such a document. I assume that's the declaration
you're asking for.

During closing argument, plaintiff's counsel em-
phasized the fact that Rowbotham had never men-
tioned the prior power of attorney before trial
despite the pretrial demands for documents and
the questioning during depositions which were
conducted throughout the discovery proceedings.
He stated that if Rowbotham's attorney did have
that document, it would have been brought out at
trial to make "an honest person out of her."
Finally, he argued that Rowbotham made up the
story about the prior power of attorney, which
indicated that much of her testimony, including all
of it regarding the directions given her by Gelder-
loos, was "pure fabrication."

Plaintiff's counsel did not overstep the bounds of
permissible advocacy in attacking Rowbotham's
credibility over her failure to produce the first
power of attorney. Rowbotham admitted that she
had not disclosed the existence of this prior docu-
ment at any time before trial. She never made

that disclosure despite the request of plaintiff's counsel for all documents pertinent to the dispute. Moreover, Rowbotham was questioned extensively at her deposition about the handling of Gelderloos' bank accounts, yet she never revealed the existence of the first power of attorney. Plaintiff's counsel can hardly be faulted for reacting with surprise and skepticism to that revelation. It was not unreasonable for him to try to attack Rowbotham's credibility for misleading plaintiff regarding the existence of an earlier power of attorney and her inability to substantiate her claim. Only with hindsight can we say that the accusations of plaintiff's counsel regarding the existence of an alleged earlier power of attorney were false. The arguments and remarks of plaintiff's counsel were based on the facts in evidence and, therefore, constituted proper advocacy.[6]

Accordingly, we reverse the trial court's order granting judgment notwithstanding the verdict and a new trial and reinstate the judgment entered pursuant to the jury verdict.

At this point, it becomes necessary to determine the rights of the various parties with respect to the family home. Plaintiff claims the trial court improperly ordered transfer of title to the home to the Rays. The parties stipulated that plaintiff was to convey title in the subject property to the Rays upon payment of the land contract balance into a court-held escrow account. That stipulation was adopted by the trial court and incorporated into an order dated July 16, 1984. Since the parties agreed to those terms and the court so ordered, there is no reason not to enforce that order.

Gelderloos' estate's entitlement to the land contract price was at that time, as it is now, a matter

[6] See *Harvey v Security Services*, 148 Mich App 260, 270; 384 NW2d 414 (1986), lv den 425 Mich 863 (1986).

separate and distinct from the Rays' right to title in the property. The agreement was made to convey title regardless of whether the estate was ultimately adjudged to be entitled to the escrowed funds. Accordingly, there was no reason to have delayed ordering transfer of title as long as the court did. If plaintiff succeeded on the merits of this case, the estate would have been entitled to the funds; if not, the estate would not be so entitled. Either way, plaintiff agreed to convey title to the Rays.

The Rays, on the other hand, claim that they are insulated from plaintiff's claim because they are bona fide purchasers of the home. There can be no such thing as a bona fide holder under a forged deed, whose good faith confers any rights against the party whose name has been forged, or those claiming under him.[7] Where a deed is forged, those innocently acquiring interests under the forged deed are in no better position as to title than if they had purchased with notice.[8] It cannot be disputed that the signature of Gelderloos on the quitclaim deed to Midkiff was forged. Rowbotham admitted that it was she, and not Gelderloos, who signed his name to the deed. Although Rowbotham claimed that she acted at the direction of Gelderloos, the jury found otherwise. As a forged document, the deed did not operate to convey title in the property to Midkiff. This, in turn, precluded the Rays from taking good title from Midkiff, and the fact that they took without notice does not insulate them from plaintiff's claim.

Finally, third-party defendant Transamerica points out that, in its October 28, 1985, order, the

---

[7] *Horvath v National Mortgage Co,* 238 Mich 354, 360; 213 NW 202 (1927).

[8] *Matthews v Aluminum Acceptance Corp,* 1 Mich App 570; 137 NW2d 280 (1965), lv den 377 Mich 702 (1966), citing *Horvath, supra.*

trial court did not address the question whether Transamerica or plaintiff would ultimately be held liable for the attorney fees paid on behalf of the Midkiff estate. Because resolution of this issue depends upon several factual determinations which are unclear from the present record, we remand this matter to the trial court.

Reversed and remanded.